## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

DALE HARAPAT,

       Plaintiff,

vs.                                                                          No. CIV 08-0512 JB/LFG

BENJIE VIGIL, PHIL ESQUIBEL,
and TONY VALDEZ, in their individual
capacities, and RICHARD FLORES,
in his official capacity,

       Defendants.

### <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** comes before the Court on Defendant Vigil's Motion for Partial Summary

Judgment on Basis of Qualified Immunity and Other Grounds, and Supporting Memorandum, filed

March 23, 2009 (Doc. 43). The court held a hearing on June 26, 2009. The primary issue is whether

Defendant Sheriff Benjie Vigil enjoys qualified immunity for the actions he took on February 15,

2007. Resolution of the issue of qualified immunity turns on four sub-issues: (i) whether Vigil

conducted an unlawful arrest of Plaintiff Dale Harapat in response to Harapat's protest in front of

the District Attorney's Office; (ii) whether Vigil used excessive force in arresting Harapat; (iii)

whether Vigil acted with malice in his arrest and is liable for malicious prosecution; and (iv)

whether Vigil engaged in unlawful retaliation against Harapat for his exercise of his First

Amendment rights. Because the Court finds that there are genuine issues of material fact regarding

both the facts leading up to the arrest and the arrest itself that preclude the dismissal of Harapat's

claims, the Court will deny Vigil qualified immunity and deny the motion for partial summary

judgment.

## FACTUAL BACKGROUND

In his statement of undisputed material facts, which Harapat largely disputes, Vigil emphasizes that these facts are undisputed for purposes of this motion only. <u>See</u> Motion at 3 n.1. Vigil also had no involvement in the events referenced in Harapat's Complaint arising out of events taking place on November 19, 2006.  <u>See</u> Affidavit of Defendant Benjie Vigil ¶ 2, at 1 (executed March 17, 2009), filed Mar. 23, 2009 (Doc. 43-2)("Vigil Aff.").

Harapat attended a hearing in state district court in Las Vegas, New Mexico on the morning of February 15, 2007.  <u>See</u> Affidavit of Dale Harapat ¶ 2, at 4, filed May 8, 2009 (Doc. 50-2) ("Harapat Aff.").  After the hearing, he had breakfast with an acquaintance, Gilbert Bustos, and they decided to protest outside the District Attorney's Office that morning.  <u>See id.</u> ¶ 3, at 4.  Harapat and Bustos began protesting at about 10:00 a.m.  <u>See id.</u> ¶ 4, at 4.

At the beginning of their protest, Harapat noticed that Bustos was carrying a handwritten sign stating something to the effect that one of the prosecutors was a "semen swallower."  He told Bustos that the sign was inappropriate and did not see Bustos displaying that sign again.  <u>See</u> Harapat Aff. ¶ 4, at 4-5.

Throughout the protest that day, Harapat carried a sign stating: "DA Flores is guilty of selective prosecution."  <u>See</u> Harapat Aff. ¶ 5, at 5.  His friend from Albuquerque, Lee Kittell, with whom Harapat had made plans to go to lunch after protesting that morning, joined Harapat and Bustos in their protest. <u>See id.</u> ¶ 6, at 5.  Harapat gave Kittell a sign stating: "The DA and LV police do not act in the best interests of children."  Harapat Aff. ¶ 7, at 5.  At no time did Kittell, Bustos, or Harapat block the entrance of the District Attorney's Office, nor did they interfere with anyone going in or out of the building.  <u>See id.</u> ¶ 9, at 5.

A short time after their protest began, Tony Valdez, Special Program Coordinator for the

-2-

District Attorney's Office, came outside with what appeared to be a video camera and held it up directed towards the protest.[1]  See id. ¶ 8, at 5; Plaintiff's Response to Defendant's Motion for Partial Summary Judgment Based on Qualified Immunity at 1, filed May 7, 2009 (Doc. 49) ("Pl. Response").  Harapat contends that, before Valdez came outside, the others and he had been quiet, and were not shouting or chanting slogans, nor did they prevent others from walking along the sidewalk or interfere with others in any way.  See Harapat Aff. ¶ 11, at 5.  When Valdez came outside, Kittell was standing on the sidewalk to the left of the entrance of the District Attorney's Office, and Harapat was a few feet away in the gravel on the opposite side of the sidewalk from the District Attorney's Office.  See Harapat Aff. ¶ 12, at 5; Pl. Response, Exhibit 6, filed May 8, 2009 (Doc. 50-5).  Harapat took a picture of Valdez filming with his cellular telephone camera. See Harapat Aff.  ¶13 at 6; see also Pl. Response Exhibit 4, filed May 8, 2009 (Doc. 50-5).

Valdez approached Bustos and the two men had an altercation, in which Valdez bumped into Bustos and blocked him from moving around him.  See Harapat Aff. ¶¶ 14-15, at 6; Pl. Response Exhibit 5 at 2, filed May 8, 2009 (Doc. 50-5).  Phil Esquibel, a deputy sheriff employed by the District Attorney's Office who is assigned to security detail, then came out of the District Attorney's Office to lend aid to Valdez.  See Harapat Aff. ¶ 16, at 6.  Harapat explains: "[H]e and Mr. Valdez made it clear they wanted us to leave."  Id.

Inside the District Attorney's Office, Dolores Turner, an employee, witnessed Bustos and Vargas outside yelling at each other and went to tell Defendant Benjie Vigil, the sheriff of San Miguel County, New Mexico, who was at the District Attorney's Office on unrelated business, that

---

[1] Though it appeared to be a video camera, there was apparently no video feed filmed.  See Deposition of Lee C. Kittell  53:1-6, at 3  (taken April 20, 2009), filed May 8, 2009 (Doc. 50-3) ("Kittell Depo.").

he was needed outside.  See Deposition of Dolores Turner 24:8-26:21, at 2-3 (taken April 21, 2009),

filed May 8, 2009 (Doc. 50-2).  Vigil went outside the building and saw three males carrying signs.[2]

See Vigil Aff. ¶ 4, at 1.  Vigil approached Harapat and the other two men, and instructed the men

to go across the street.[3]  See Harapat Aff. ¶ 17, at 6.  Harapat contends that after Vigil instructed

Bustos, Kittell, and Harapat to move across the street, Kittell said something along the lines of "we

were just exercising our First Amendment rights."  Id. ¶ 19, at 7.  See Kittell Depo. 58:20-25, at 5

("[Vigil] told us we couldn't be there. We had to leave. We politely said, 'It's a public building, it's

a public sidewalk, we're exercising our First Amendment right.'").  Harapat describes Vigil as

becoming red in the face and showing visible anger.  See Harapat Aff. ¶ 19, at 7.  Harapat told Vigil

---

[2] There is a factual dispute whether Bustos, Kittell, and Harapat were yelling at Valdez when Vigil went outside.  See Harapat Aff. ¶¶ 17-23, at 6-7; Vigil Aff. ¶¶ 4-5, at 1-2.  At this stage in the proceedings, the Court must only decide whether there exists a genuine issue of material fact. So long as a reasonable jury could find that Harapat's version is the more credible, the Court must view the facts in the light most favorable to Harapat.

[3] The Court notes that there is also a factual dispute whether or not Vigil told the men to lower their voices.  See Harapat Aff. ¶ 23, at 4; Vigil Aff. ¶ 5, at 2. Vigil contends Bustos came up to him and told him in a loud voice that they had a right to be there because it was a public sidewalk. See Vigil Aff. ¶ 6, at 2.  He also contends that Harapat approached him and stated that Vigil was violating his constitutional rights.  See id. ¶ 7, at 2. Vigil states his instruction to move was ignored and that the men became more argumentative.  See id. ¶ 10, at 2.  In Harapat's Amended Complaint, he pled that Vigil "ordered the demonstrators to lower their voices . . . ."  Amended Complaint ¶ 12. This statement may be a judicial admission, which could have the effect of withdrawing the fact from issue.  See U.S. Energy Corp. v. Nukem, Inc., 400 F.3d 822, 833 n.4 (10th Cir. 2005)(stating that "[j]udicial admissions are formal, deliberate declarations which a party or his attorney makes in a judicial proceeding for the purpose of dispensing with proof of formal matters or of facts about which there is no real dispute."); Guidry v. Sheet Metal Workers Int'l Assn., Local 9, 10 F.3d 700, 716 (10th Cir. 1993)(stating that "[j]udicial admissions are formal admissions . . . which have the effect of withdrawing a fact from issue and dispensing wholly with the need for proof of the fact.")(citation omitted).  In his deposition, however, when asked about the statement in the Amended Complaint, Harapat stated: "This is an oversight on my part.  But never at any time did he tell -- tell us to lower our voices . . . ."  Harapat Depo. 151:17-18.  Without more briefing on the issue of judicial admission, the Court is reluctant to find any more at this stage except that there is a factual dispute.

that they had been at the District Attorney's Office to protest on prior occasions.  See id.  Vigil again

instructed Harapat and the other men: "If you don't go across the street, I am going to arrest you."

Kittell Depo. 59:2-4.  Harapat contends that the location to which Vigil wanted Harapat, Bustos, and

Kittell to move was a block of private homes, and was not as open to the public's view.  See Harapat

Aff. ¶ 18, at 3.

When Harapat and the other two men did not immediately relocate, Vigil placed the men

under arrest.  See id.  Harapat was handcuffed behind his back without resistence.[4]  See Harapat Aff.

¶¶ 20-21, at 7.  Vigil escorted Harapat to his vehicle.  See id. ¶ 24, at 7.[5]  Harapat informed Vigil that

the handcuffs were hurting his wrists.  See id.  Harapat states that Vigil responded by pushing him

into the vehicle, causing Harapat's legs to strike the truck because it was too high for him to step

into and because he was unable to brace himself with his hands handcuffed behind him.  See id.

Harapat also explains that he had trouble breathing in the vehicle, because the windows were rolled

up and he was suffering from sinus trouble and stress.  See id. ¶ 25, at 7.  Harapat states that he

informed Vigil that his wrists hurt from the handcuffs and that he could not breathe, but that Vigil

did not respond.  See id. ¶ 26, at 8.  The three men were transported to the San Miguel County

---

[4] There is a dispute over what Vigil told Harapat and the others before arresting them. Harapat contends Vigil told them only to leave the area.  See Harapat Aff. ¶¶ 17-23, at 3-4; Kittell Depo. 58:20-59:4, at 5.  Vigil contends he told them they could stay and do whatever they were doing, but that they needed to stand further back from the District Attorney's Office building and sidewalk so the general public could have access to enter and exit.  See Vigil Aff. ¶ 9, at 2.  Vigil also contends that Harapat and the other two men yelled at him "go ahead and arrest us!"  Id. ¶ 13, at 2.

[5] Harapat submitted the Deposition of Phil Esquibel as supporting evidence in response to Vigil's summary judgment motion.  In his deposition, Esquibel states that Vigil instructed him to escort Harapat to Vigil's vehicle.  See Deposition of Phil Esquibel 67:16-21, at 3 (taken April 21, 2009)(Doc. 50-7).  Esquibel's statement conflicts with the account Vigil gave in his affidavit.  See Vigil Aff. ¶ 14, at 2-3.

Detention Center, where Vigil consulted with the District Attorney's Office by telephone and then filed an Amended Criminal Complaint in Magistrate Court against Harapat, charging him with public nuisance, contrary to NMSA § 30-8-1, disorderly conduct, contrary to NMSA § 30-20-1A, and unlawful assembly, contrary to NMSA § 30-20-3.   See Motion, Exhibit B, at 1, filed May 23, 2009 (Doc. 43-3).  Bustos and Kittell were charged with the same offenses.  See Motion, Exhibit D, at 1, filed May 23, 2009 (Doc. 43-5);  Exhibit F, at 1, filed May 23, 2009 (Doc. 43-7).  Vigil took photographs of the signs that were found at the scene of the protest.  See Motion, Exhibit H, at 1-2, filed Mar. 23, 2009 (Doc. 43-9).

From the detention center, Harapat was transported to the hospital, because of  the pain in his wrists and leg, and because of the trouble he experienced while breathing.  See Harapat Aff. ¶ 28, at 8.  As a result of the handcuffs, Harapat sustained redness and marks around both wrists, and redness and bruising on his upper left leg.  See id. ¶ 29, at 8.  Harapat contends that, to this day, he has limited flexibility and pain in his right wrist.  See id.

## PROCEDURAL BACKGROUND

Harapat filed his Amended Complaint on December 18, 2008 (Doc. 29) ("Amended Complaint"), asserting violations of federal and state law against Vigil stemming from Harapat's arrest on February 15, 2007.  Harapat asserts claims against Vigil pursuant to 42 U.S.C. § 1983 for unlawful arrest, excessive force, unlawful retaliation, and malicious prosecution under the Fourth and Fourteenth Amendments.  In Count I, Harapat alleges unlawful arrest under § 1983 against various Defendants, including Vigil.  See Amended Complaint ¶¶ 17-20, at 4.  In Count II, Harapat alleges excessive force against Vigil and other Defendants under § 1983.  See id. ¶¶ 21-25, at 5.  In Count III, Harapat alleges unlawful retaliation pursuant to 42 U.S.C. § 1983 against Vigil and other Defendants.  See id. ¶¶ 26-30, at 5-6.  Count IV is a claim for malicious prosecution under

§ 1983 against Vigil.  See id. ¶¶ 31-36, at 6.

Count V is a claim for injunctive relief against Vigil and another Defendant.  See id. ¶¶ 37-43, at 6-7.  Count VI consists of state tort claims for alleged assault, battery, false arrest, false imprisonment, and malicious abuse of process against Vigil and other Defendants.  See Amended Complaint ¶¶ 44-47, at 8-9.

Vigil contends that, because of the dispositive nature of this motion, he did not seek the concurrence of opposing counsel.  Vigil moves for partial summery judgment on Harapat's federal-law claims on the basis of qualified immunity.  Vigil contends that the Court should grant him qualified immunity as a matter of law and dismiss Harapat's federal constitutional claims against him with prejudice.  The motion does not address the viability of the claims in Counts V and VI.  Vigil concedes that, if the Court grants him motion, Harapat's state tort claims against Vigil survive.

Vigil argues that the Court should grant him qualified immunity on the federal constitutional claims because Harapat will be unable to meet the two-pronged burden of showing that Vigil's conduct violated Harapat's constitutional rights and that those rights were clearly established at the time of the incident.  See Motion at 8.

Vigil contends there was nothing "objectively unreasonable" about his conduct in the underlying events and therefore Harapat cannot establish his unlawful arrest claim.  Motion at 8-9.  Vigil argues that he gave repeated instructions to Harapat and the other two men to lower their voices, and to stand further back from the District Attorney's Office, and when Harapat did not comply with the instructions, he was in violation of NMSA § 66-7-4, which provides: "No person shall willfully fail or refuse to comply with any lawful order or direction of any police officer . . . ."  Motion at 9.  Vigil contends that his actions in response to this violation were "objectively

reasonable" and, thus, Harapat cannot establish the first prong necessary to overcome the qualified-immunity defense for Harapat's first two claims.  See Motion at 9-10.  He also contends that Harapat cannot establish the second prong, that Vigil violated a "clearly established" law, because Vigil is unaware of any legal authority which has held that it is unlawful to arrest an individual for disregarding the directives of a law-enforcement officer.  See Motion at 10.

Harapat notes that the facts of February 17, 2009 are in dispute and that "it is a jury question in a civil rights suit whether an officer had probable cause to arrest."  Pl. Response at 11 (quoting Buck v. City of Albuquerque, 549 F.3d 1269, 1281 (10th Cir. 2008)).  Harapat states that, viewing the facts in the light most favorable to him, they indicate that he was protesting peacefully, and that there is no evidence that he or the other two men had disturbed anyone before Vigil and the other Defendants confronted them.  See Pl. Response at 13.  Moreover, Harapat points out that NMSA § 66-7-4, as Vigil quoted in his argument justifying probable cause, is incomplete and is, rather, a traffic statute.  See Response at 11.  NMSA § 66-7-4, in full, states: "No person shall willfully fail or refuse to comply with any lawful order or direction of any police officer invested by law with authority to direct, control, or regulate traffic."  NMSA § 66-7-4 (1978).  Harapat contends that he did not fail or refuse to obey Vigil's orders on February 17, 2009.  See Pl. Response at 11.

Vigil further argues that the qualified-immunity defense is warranted with regards to Harapat's excessive force claim because the Court is permitted to evaluate the degree of force used as a matter of law when there is an underlying provocation which justifies force.  See Motion at 10 (citing Singer v. Wadman, 745 F.2d 606, 608-09 (10th Cir. 1984)).  Vigil argues that the legality of Harapat's arrest is immaterial to a determination whether excessive force is used because law-enforcement officers are entitled to use that amount of force which they believe is reasonably necessary to overcome resistance and to effect an arrest.  See Motion at 11 (citing Graham v.

-8-

Connor, 490 U.S. 386, 396 (1989).  Vigil contends that, because he used the amount of force that he believed was reasonably necessary to overcome Harapat's very minimal resistance to arrest, Harapat cannot offer evidence to show the use of force was excessive under an "objective reasonableness" standard.  Motion at 12.

Harapat contends that the standard for excessive force is an objective standard of what a "reasonable and prudent law enforcement officer would have applied," and is not a subjective standard, and thus it is irrelevant what Vigil believed was reasonable.  See Pl. Response at 15 (citing Graham v. Conner, 490 U.S. 386, 396 (1968)).  Harapat argues four points for why he has met his burden to overcome qualified immunity on his excessive-force claim: (i) Harapat did not commit a crime; (ii) the crimes for which he was arrested were all petty misdemeanors and none of them involved any threat of immediate harm to the person of another; (iii) there is no indication that Harapat actively resisted his arrest or attempted to evade arrest by flight; and (iv) Vigil acted gratuitously, not reasonably, when he injured Harapat's wrist by handcuffing him too tightly and then refusing to loosen them despite Harapat's request to do so.  See Pl. Response at 16.

Vigil further contends that he is entitled to qualified immunity on Harapat's malicious-prosecution claim because he believed he had probable cause to charge Harapat with public nuisance, disorderly conduct, and unlawful assembly under New Mexico law.  See Motion at 12-13.  Vigil argues that it is well settled that law enforcement officials who reasonably but mistakenly conclude that probable cause exists are entitled to qualified immunity, see Motion at 12 (citing Hunter v. Bryant, 502 U.S. 224, 227 (1991), and, therefore, Vigil is entitled to qualified immunity, even if Vigil was mistaken in his belief that he had probable cause to arrest Harapat, see Motion at 13.

Harapat contends that there is sufficient evidence from which a jury could reasonably infer

that Vigil acted with the requisite malice by his angry demeanor, his attempt to unlawfully disperse the protesters who were publicly criticizing law enforcement, and his refusal to loosen Harapat's handcuffs, and thus Vigil is not entitled to qualified immunity protection from Harapat's malicious-prosecution claim.  See Pl. Response at 20.

Vigil also argues that Harapat will not be able to establish evidence of unlawful retaliation because Vigil had no involvement in a prior incident involving Harapat on November 19, 2006, and it was by chance that Vigil was at the District Attorney's Office on February 17, 2007.  See Motion at 13.  Vigil contends that, without knowledge of any past incident, Harapat cannot show that Vigil's actions constitute retaliation.  See Motion at 13-14.

Harapat contends that Vigil was "certainly aware" that Harapat was engaging in constitutionally protected free speech on February 15, 2007, and that there is a reasonable inference which can be drawn that Vigil was motivated to arrest Harapat because he was exercising his protected free speech rights.  See Pl. Response at 19-20.

Vigil urges the Court to grant qualified immunity because Vigil contends its purpose, to shield government officials from the burdens of defending a lawsuit, will be for naught if the Court refuses to consider granting summary judgment prior to trial.  See Motion at 10.

## STANDARD FOR SUMMARY JUDGMENT

Summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  The movant bears the initial burden of "show[ing] that there is an absence of evidence to support the nonmoving party's case."  Bacchus Indus., Inc. v. Arvin Indus., Inc., 939 F.2d 887, 891 (10th Cir. 1991)(internal quotation marks omitted).  See Corp. v. Catrett, 477 U.S. 317, 323 (1986).

Once the movant meets this burden, rule 56(e) requires the nonmoving party to designate specific facts showing that there is a genuine issue for trial.  See Celotex Corp. v. Catrett, 477 U.S. at 324; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); Vitkus v. Beatrice Co., 11 F.3d 1535, 1539 (10th Cir. 1993)("However, the nonmoving party may not rest on its pleadings but must set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof.")(internal quotation omitted); Otteson v. United States, 622 F.2d 516, 519 (10th Cir. 1980)("However, once a properly supported summary judgment motion is made, the opposing party may not rest on the allegations contained in his complaint, but must respond with specific facts showing the existence of a genuine factual issue to be tried.")(internal quotation omitted).  The party opposing a motion for summary judgment must "set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof."  Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d 1238, 1241 (10th Cir. 1990).  Rule 56 provides that "an opposing party may not rely merely on allegations or denials in its own pleadings; rather, its response must -- by affidavits or as otherwise provided in this rule -- set out specific facts showing a genuine issue for trial."  Fed. R. Civ. P. 56(e)(2).

It is not enough for the party opposing a properly supported motion for summary judgment to "rest on mere allegations or denials of his pleadings."  Anderson v. Liberty Lobby, Inc., 477 U.S. at 256.  See Abercrombie v. City of Catoosa, 896 F.2d 1228, 1231 (10th Cir. 1990).  "The non-moving party cannot avoid summary judgment by repeating conclusory opinions, allegations unsupported by specific facts, or speculation."  Colony Nat'l Ins. Co. v. Omer, No. 07-2123, 2008 U.S. Dist. LEXIS 45838,  at * 1 (D. Kan. June 2, 2008)(citing Fed. R. Civ. P. 56(e) and Argo v. Blue Cross and Blue Shield of Kan., Inc., 452 F.3d 1193, 1199 (10th Cir. 2006)).  "In responding to a motion for summary judgment, 'a party cannot rest on ignorance of facts, on speculation, or on

suspicion and may not escape summary judgment in the mere hope that something will turn up at trial.'" Colony Nat'l Ins. Co. v. Omer, 2008 U.S. Dist. LEXIS 45838, at *1 (quoting Conaway v. Smith, 853 F.2d 789, 794 (10th Cir. 1988)).

Genuine factual issues must exist that "can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Anderson v. Liberty Lobby, Inc., 477 U.S. at 250. The mere existence of a scintilla of evidence will not avoid summary judgment. See Vitkus v. Beatrice Co., 11 F.3d at 1539. There must be sufficient evidence on which the fact-finder could reasonably find for the nonmoving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. at 251; Vitkus v. Beatrice Co., 11 F.3d at 1539. "[T]here is no evidence for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable . . . or is not significantly probative, . . . summary judgment may be granted." Anderson v. Liberty Lobby, Inc., 477 U.S. at 249 (internal citations omitted). Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

## LAW REGARDING QUALIFIED IMMUNITY

As the Court has previously recognized in Holguin v. City of Albuquerque, No. Civ. 05-0302, 2006 U.S. Dist. LEXIS 29489 (D.N.M. Mar. 1, 2006):

> Qualified immunity recognizes the legitimate "need to protect officials who are required to exercise their discretion and the related public interest in encouraging the vigorous exercise of official authority." Harlow v. Fitzgerald, 457 U.S. 800, 807 (1982)(quoting Butz v. Economou, 438 U.S. 478, 506 (1978)). Qualified immunity therefore "provides ample protection to all but the plainly incompetent or those who knowingly violate the law." Malley v. Briggs, 475 U.S. 335, 341 (1986).

2006 U.S. Dist. LEXIS 29489, at *15-16. Qualified immunity protects federal and state officials

-12-

from liability for discretionary functions, and from "the unwarranted demands customarily imposed upon those defending a long drawn-out lawsuit." Siegert v. Gilley, 500 U.S. 226, 232 (1991).   To balance the interests of the complaining individual, and the burden put upon the government official in defending such cases, "courts recognize the affirmative defense of qualified immunity, which protects 'all but the plainly incompetent or those who knowingly violate the law.'" Gross v. Pirtle, 245 F.3d 1151, 1155 (10th Cir. 2001)(quoting Malley v. Briggs, 475 U.S. at 341).

### 1.     Rationale for Qualified-Immunity Doctrine.

Qualified immunity is judicially created and rooted in public policy.  The fear of suit may have a chilling effect on official decision-making, seriously deterring officials from exercising judgment with the decisiveness important to their office.  See Richardson v. McKnight, 521 U.S. 399, 407 (1997)(describing the purposes of qualified immunity "as protecting government's ability to perform its traditional functions by providing immunity where necessary to preserve the ability of government officials to serve the public good or to ensure that talented candidates were not deterred by the threat of damages suits from entering public service.")(internal quotations omitted); Wyatt v. Cole, 504 U.S. 158, 165 (1992)(detailing the public policy basis for the qualified immunity privilege). In  Harlow v. Fitzgerald, 457 U.S. 800 (1982), the Supreme Court of the United States stated:

> It cannot be disputed seriously that claims frequently run against the innocent as well as the guilty -- at a cost not only to the defendant officials, but to society as a whole. . . . [T]here is the danger that fear of being sued will dampen the ardor of all but the most resolute, or the most irresponsible [public officials], in the unflinching discharge of their duties.

Id. at 814 (internal citations and quotations omitted).

### 2.     Two-Part Test for Qualified Immunity.

Courts must use a two-step analysis in deciding whether a party is entitled to qualified

immunity.  The broad protection afforded by qualified immunity gives officials "a right, not merely to avoid 'standing trial,' but also to avoid the burdens of 'such pretrial matters as discovery.'" Holland ex rel. Overdorff v. Harrington, 268 F.3d 1179, 1185 (10th Cir. 2001)(quoting Behrens v. Pelletier, 516 U.S. 299, 308 (1996)).  When a defendant raises the affirmative defense of qualified immunity, "a ruling on that issue should be made early in the proceedings so that the costs and expenses of trial are avoided where the defense is dispositive."  Saucier v. Katz, 533 U.S. 194, 200 (2001), overruled in part by Pearson v. Callahan, 129 S. Ct. 808, 818-20 (2009).  The qualified immunity privilege is "'an immunity from suit rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial.'" Saucier v. Katz, 533 U.S. at 200-201 (quoting Mitchell v. Forsyth, 472 U.S. 511, 526 (1985)).

Once a defendant asserts the affirmative defense of qualified immunity, the burden then shifts to the plaintiff  to establish a violation of a constitutional or statutory right by the defendant and that the applicable law is clearly established at the time of the alleged violation.  See Gross v. Pirtle, 245 F.3d at 1155; Currier v. Doran, 242 F.3d 905, 917 (10th Cir. 2001), cert. denied, 534 U.S. 1019 (2001); Scull v. New Mexico, 236 F.3d 588, 595 (10th Cir. 2000).  In Saucier v. Katz, the Supreme Court stated:

> A court required to rule upon the qualified immunity issue must consider, then, this threshold question: Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?  This must be the initial inquiry. . . .  In the course of determining whether a constitutional right was violated on the premise alleged, a court might find it necessary to set forth principles which will become the basis for a holding that a right is clearly established.  This is the process for the law's elaboration from case to case, and it is one reason for our insisting upon turning to the existence or nonexistence of a constitutional right as the first inquiry.  The law might be deprived of this explanation were a court simply to skip ahead to the question whether the law clearly established that the officer's conduct was unlawful in the circumstances of the case.

533 U.S. at 201 (citations omitted).  Under the requirements that the Supreme Court set forth in

Saucier v. Katz, if a plaintiff meets his or her burden of establishing a violation of a constitutional right, he or she must demonstrate that the right alleged to have been violated was clearly established at the time of the defendant's allegedly unlawful conduct.   See Holland ex rel. Overdorff v. Harrington, 268 F.3d at 1186; Gross v. Pirtle, 245 F.3d at 1156; Albright v. Rodriguez, 51 F.3d 1531, 1534 (10th Cir. 1995).  If the plaintiff fails to satisfy either part of this two-part inquiry, the court must grant the defendant qualified immunity.  See Holland ex rel. Overdorff v. Harrington, 268 F.3d at 1186; Gross v. Pirtle, 245 F.3d at 1156; Albright v. Rodriguez, 51 F.3d at 1535.  "In short, although we will review the evidence in the light most favorable to the nonmoving party . . . the record must clearly demonstrate the plaintiff has satisfied his heavy two-part burden; otherwise, the defendants are entitled to qualified immunity."   Holland ex rel. Overdorff v. Harrington, 268 F.3d at 1186 (citing Medina v. Cram, 252 F.3d 1124, 1128 (10th Cir. 2001)).

### 3.      Clearly Established Law.

Qualified immunity shields state officials from liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Harlow v. Fitzgerald, 457 U.S. at 818.  A clearly established right is generally defined as a right so thoroughly developed and consistently recognized under the law of the jurisdiction as to be "indisputable" and "unquestioned."   Zweibon v. Mitchell, 720 F.2d 162, 172-173 (D.C. Cir. 1983), cert. denied, 469 U.S. 880 (1984).  "Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains."  Strepka v. Miller, 2001 WL 1475058 at * 5 (10th Cir. 2001)(citing Currier v. Doran, 242 F.3d at 923).  See Medina v. City and County of Denver, 960 F.2d 1493, 1498 (10th Cir. 1992).  "In determining whether the right was 'clearly established,' the court assesses the objective legal reasonableness of

the action at the time of the alleged violation and asks whether the 'the contours of the right [were] sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" Holland ex rel. Overdorff v. Harrington, 268 F.3d at 1186 (quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987)).

As the Supreme Court has observed, it is generally not necessary to find a controlling decision declaring the "very action in question . . . unlawful." Anderson v. Creighton, 483 U.S. at 640. However, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Id. at 635.

In the Tenth Circuit, to carry the burden of identifying a clearly established right, the plaintiff "must demonstrate a substantial correspondence between the conduct in question and prior law allegedly establishing that the defendant's actions were clearly prohibited." Trotter v. Regents of the University of New Mexico, 219 F.3d 1179, 1184 (10th Cir. 2000)(quoting Hannula v. City of Lakewood, 907 F.2d 129, 131 (10th Cir. 1990), abrogated on other grounds by Dixon v. Richer, 922 F.2d 1456, 1461 (10th Cir. 1991)).  Moreover, that an official action may be in violation of an agency's internal procedures does not, in itself, violate any clearly established constitutional right. See Herring v. Keenan, 218 F.3d 1171, 1180-81 (10th Cir. 2000)(explaining "that the fact that an official discloses information in violation of his own internal procedures does not make the disclosure a violation of a clearly established constitutional right to privacy."); Roska ex rel. Roska v. Peterson, 328 F.3d 1230, 1251 (10th Cir. 2003)("In considering the 'objective legal reasonableness' of the state officer's actions, one relevant factor is whether the defendant relied on a state statute, regulation, or official policy that explicitly sanctioned the conduct in question.").

The plaintiff's burden to establish that the right is clearly established "must be undertaken in light of the case's specific context, not as a broad proposition." Saucier v. Katz, 533 U.S. at 201.

"The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation." Id. at 202. "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent." Mimics, Inc. v. Village of Angel Fire, 394 F.3d at 842 (internal citations and quotations omitted). If a reasonable person could have believed that the actions were lawful, "defendants are entitled to dismissal before discovery." Workman v. Jordan, 958 F.2d 332, 336 (10th Cir. 1992).

### 4.    Pearson v. Callahan.

The Supreme Court recently revisited the proper procedure for lower courts to evaluate a qualified-immunity defense. In Pearson v. Callahan, the Supreme Court held that, "while the sequence set forth [in Saucier v. Katz] is often appropriate, it should no longer be regarded as mandatory." 129 S. Ct. at 818. Rather, lower courts "should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances of the particular case at hand." Id. The Supreme Court also noted that, while no longer mandatory, the protocol outlined in Saucier v. Katz would often be beneficial. See Pearson v. Callahan, 129 S. Ct. at 819.

While leaving the determination whether to adhere to the Saucier v. Katz sequence in the lower courts' sound discretion, the Supreme Court mentioned various circumstances where the prior mandatory sequencing might be undesirable. For example, there are cases in which it is plain that a right is not clearly established, but less obvious whether such a right in fact exists. See Pearson v. Callahan, 129 S. Ct. at 819. Under such circumstances, it might be considered a waste of resources to engage in analysis under the first prong -- whether a constitutional right was violated --

-17-

when it is already obvious that, even if such a right existed, it was not clearly established.  See id.

Another concern arises out of the fact that qualified immunity is usually raised at the pleading stage.  The Supreme Court in Pearson v. Callahan observed that the "two-step" inquiry can be an uncomfortable exercise where "the answer [to] whether there was a violation may depend on a kaleidoscope of facts not yet fully developed."  Id. (brackets in original)(internal quotation marks and citation omitted).  Under such circumstances, it may be more advantageous to analyze whether the asserted right was clearly established rather than reaching the merits.  Id.

According to the Supreme Court, adherence to the mandatory sequencing in Saucier v. Katz also poses the potential to lead to bad decision-making.  For example, in some cases that the district courts encounter, "the briefing of constitutional questions is woefully inadequate," and "constitutional questions may be prematurely and incorrectly decided in cases where they are not well presented."  Pearson v. Callahan, 129 S. Ct. at 820 (internal quotation marks and citations omitted).  Moreover, according to the Supreme Court, while a court might adhere to the formalities of Saucier v. Katz in discussing the two prongs in sequence, the court's internal processes might involve making a decision based on whether the right was clearly established and only then turning to the more difficult question of the merits.  See Pearson v. Callahan, 129 S. Ct. at 819.  The Supreme Court feared that, in some such cases, there is a risk that the district court will not devote as much care as it should to deciding the constitutional issue.  See id.

"Rigid adherence to the Saucier rule may make it hard for affected parties to obtain appellate review of constitutional decisions that may have a serious prospective effect on their operations."  Pearson v. Callahan, 129 S. Ct. at 820.  Additionally, an obligation to strictly follow Saucier v. Katz runs up against the "general rule of constitutional avoidance and runs counter to the older, wiser counsel not to pass on questions of constitutionality . . . unless such adjudication is unavoidable."

Pearson v. Callahan, 129 S. Ct. at 821 (internal quotation marks and citations omitted). Furthermore, the first prong's purpose of furthering the development of constitutional law might not be meaningfully advanced in cases where the determination whether a right was violated is so fact bound that it is unlikely to provide guidance in future cases. See id. at 12.

## LAW REGARDING UNLAWFUL ARREST

"A police officer violates an arrestee's clearly established Fourth Amendment right to be free of unreasonable seizure if the officer makes a warrantless arrest without probable cause." Olsen v. Layton Hills Mall, 312 F.3d 1304, 1312 (10th Cir. 2002)(citing Tennessee v. Garner, 471 U.S. 1, 7 (1985)). A police officer may effectuate a warrantless arrest so long as there is probable cause for the arrest. See Michigan v. DeFillippo, 443 U.S. 31, 36 (1979). "Probable cause exists if facts and circumstances within the arresting officer's knowledge and of which he or she had reasonably trustworthy information are sufficient to lead a prudent person to believe that the arrestee has committed or is committing an offense." Keylon v. City of Albuquerque, 535 F.3d 1210, 1216 (10th Cir. 2008)(quoting Romero v. Fay, 45 F.3d 1472, 1476 (10th Cir. 1995)).

"When a warrantless arrest is the subject of a [§] 1983 action, the defendant arresting officer is entitled to immunity if a reasonable officer could have believed that probable cause existed to arrest the plaintiff." Romero v. Fay, 45 F.3d 1472, 1476 (10th Cir. 1995)(citations and internal quotations omitted). See Hunter v. Bryant, 502 U.S. 224, 227 (1991). As with reasonable suspicion, officers are entitled to qualified immunity with respect to probable cause if they had "arguable probable cause"; they are not required to have had actual probable cause. Cortez v. McCauley, 478 F.3d at 1120 & n.15. "Even law enforcement officials who reasonably but mistakenly conclude that

-19-

probable cause is present are entitled to immunity." Id. (citation and internal quotations omitted).[6]

The Tenth Circuit has stated:

> [A] police officer's subjective reason for making the arrest need not be the criminal offense as to which the known facts provide probable cause. An arrest is not invalid under the Fourth Amendment simply because the police officer subjectively intended to base the arrest on an offense for which probable cause is lacking, so long as the circumstances, viewed objectively, justify the arrest. Subjective intent of the arresting officer, however it is determined (and of course subjective intent is always determined by objective means), is simply no basis for invalidating an arrest. Those are lawfully arrested whom the facts known to the arresting officers give probable cause to arrest . . . .

Apodaca v. City of Albuquerque, 443 F.3d 1286, 1289 (10th Cir. 2006)(internal citations and quotations omitted).

## LAW REGARDING EXCESSIVE FORCE

When an officer moves for qualified immunity on an excessive force claim, "a plaintiff is required to show that the force used was impermissible (a constitutional violation) and that objectively reasonable officers could not have thought the force constitutionally permissible (violates clearly established law)." Cortez v. McCauley, 478 F.3d 1108, 1128 (10th Cir. 2007). Courts analyze Fourth-Amendment excessive force claims "under the 'objective reasonableness' standard that governs other Fourth Amendment inquiries." Cordova v. Aragon, 2009 WL 1707919, at *3 (10th Cir. 2009). See Graham v. Connor, 490 U.S. 386, 395 (1989)("[A]ll claims that law enforcement officers have used excessive force . . . in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its

---

[6] Only reasonable mistakes of fact, not reasonable mistakes of law, will leave a finding of probable cause in tact. See United States v. DeGasso, 369 F.3d 1139, 1144-45 (10th Cir. 2004) (stating that, "[w]hile an officer's reasonable but mistaken understanding of the facts justifying a search or seizure does not negate the legitimacy of a probable cause determination, an officer's reasonable but mistaken understanding of the applicable law he is enforcing does.").

'reasonableness' standard.").  The Tenth Circuit has explained:

> Reasonableness is evaluated under a totality of the circumstances approach which requires that we consider the following factors: the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.

Weigel v. Broad, 544 F.3d 1143, 1151-52 (10th Cir. 2008)(internal quotation marks and citations omitted).  Additionally, a court must judge the reasonableness of a particular use of force from "the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight . . . . That perspective includes an examination of the information possessed by the [officers]." Id. at 1152 (citations and internal quotation marks omitted).

Whether an officer acts unconstitutionally in handcuffing an individual depends on the objective reasonableness of the officers' actions.  See Silvan W. v. Briggs, 309 Fed. Appx. 216, 224 (10th Cir. 2009).  While the Tenth Circuit "ha[s] consistently rejected a bright-line rule requiring plaintiffs to demonstrate physical injury when bringing excessive force claims . . .[,] when an excessive force claim relies upon unduly tight handcuffing, [the Tenth Circuit has] held that the plaintiff must show some actual injury."   Vondrak v. City of Las Cruces, 535 F.3d 1198, 1208 (10th Cir. 2008).

Thus, the Tenth Circuit has held that officers committed no constitutional violation when they handcuffed and detained for over an hour two individuals who were arrested for violating Utah's obstruction-of-justice statute.  See Silvan W. v. Briggs, 309 Fed.Appx. at 224.  One of the detainees alleged in his affidavit that he suffered chaffing and soreness of wrists, and extreme emotional trauma, as a result of being publicly displayed in handcuffs.  See id.  In holding that the arresting officers did not use excessive force, the Tenth Circuit reasoned:

While Cory and Megan were not arrested for an especially severe crime and were not actively resisting arrest or attempting to flee, the officers could have been reasonably concerned for their safety, given their awareness that Cory was a peace officer and might have been armed. Further, Cory and Megan were released upon A.W.'s arrival at the home, and therefore, were not detained any longer than necessary to resolve the situation which necessitated police involvement. And because there is no evidence that Cory suffered more than a de minimis injury or that he notified the officers that his handcuffs were painful, he cannot maintain an excessive force claim based on unduly tight handcuffing . . . . Similarly, there is no evidence that Cory suffered any injury from being denied liquids . . . . Finally, while we do not doubt that being detained in handcuffs in public view would be traumatic, not every indignity – even if it may later seem unnecessary in the peace of a judge's chambers – rises to the level of a constitutional violation.

Id. at 224-25 (citations and internal quotation marks omitted). The Tenth Circuit has also explained:

[I]n cases involving claims of both unlawful arrest and excessive force arising from a single encounter, it is necessary to consider both the justification the officers had for the arrest and the degree of force they used to effect it. If the plaintiff can prove that the officers lacked probable cause, he is entitled to damages for the unlawful arrest, which includes damages resulting from any force reasonably employed in effecting the arrest. If the plaintiff can prove that the officers used greater force than would have been reasonably necessary to effect a lawful arrest, he is entitled to damages resulting from that excessive force. These two inquiries are separate and independent, though the evidence may overlap. The plaintiff might succeed in proving the unlawful arrest claim, the excessive force claim, both, or neither.

Cortez v. McCauley, 478 F.3d at 1127. Moreover, "in a case where police effect an arrest without probable cause or a detention without reasonable suspicion, but use no more force than would have been reasonably necessary if the arrest or the detention were warranted, the plaintiff has a claim for unlawful arrest or detention but not an additional claim for excessive force." Id. at 1126.

## LAW REGARDING MALICIOUS PROSECUTION

A claim for a constitutional violation based on malicious prosecution requires that five elements be met. As the United States Court of Appeals for the Tenth Circuit has stated:

Under our cases, a § 1983 malicious prosecution claim includes the following elements: (1) the defendant caused the plaintiff's continued confinement or prosecution; (2) the original action terminated in favor of the plaintiff; (3) no probable cause supported the original arrest, continued confinement, or prosecution; (4) the defendant acted with malice; and (5) the plaintiff sustained damages.

Wilkins v. DeReyes, 528 F.3d 790, 799 (10th Cir. 2008).  Probable cause is a requirement for a malicious prosecution claim, but "false information" that was submitted to the finder of probable cause cannot be considered when ascertaining whether probable cause existed at the time of the probable-cause determination.  Id. at 801.

### LAW REGARDING FIRST-AMENDMENT RETALIATION CLAIMS

It is "settled that as a general matter, the First Amendment prohibits government officials from subjecting an individual to retaliatory actions, including criminal prosecutions, for speaking out." Hartman v. Moore, 547 U.S. at 256 (citation omitted).  "Official reprisal for protected speech 'offends the Constitution [because] it threatens to inhibit exercise of the protected right.'" Hartman v. Moore, 547 U.S. 250, 256 (2006)(quoting Crawford-El v. Britton, 523 U.S. 574, 588 n.10 (1988)).

When a plaintiff asserts that the retaliation for protected conduct is a criminal charge, there is usually a "distinct body of highly valuable circumstantial evidence available and apt to prove or disprove retaliatory causation, namely evidence showing whether there was or was not probable cause to bring the criminal charge." Id. at 261. A plaintiff in a retaliatory-prosecution case must demonstrate retaliatory animus as the cause of injury, and the defendant may respond by showing that the action would have been taken anyway, independently of any retaliatory animus.  See id. 160-61.  In light of Hartman v. Moore, the Tenth Circuit has held:

> To establish a § 1983 retaliation claim against non-immune officials, [a plaintiff] must plead and prove (1) that she was engaged in a constitutionally protected activity; (2) that a defendant's action caused her to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity; and (3) that a defendant's action was substantially motivated as a response to her exercise of her First Amendment speech rights. Worrell v. Henry, 219 F.3d 1197, 1212 (10th Cir. 2000). She also must plead and prove the absence of probable cause for the prosecution. Hartman [v. Moore], 126 S.Ct. at 1707.

Becker v. Kroll, 494 F.3d 904, 925 (10th Cir. 2007). "When the plaintiff alleges that the defendant's

action was taken in retaliation for protected speech, [the] standard for evaluating that chilling effect on speech is objective, rather than subjective." Smith v. Plati, 258 F.3d 1167, 1175-77 (10th Cir. 2001).

"To survive summary judgment on the retaliation claim, [the plaintiff] must present a genuine issue of material fact as to whether a non-immune defendant influenced the decision to prosecute in retaliation for protected speech." Hartman v. Moore, 547 U.S. at 926.

## ANALYSIS

In his motion for partial summary judgment Vigil seeks dismissal of Harapat's federal claims against him on the ground that he is entitled to qualified immunity.  Vigil argues that there was nothing "objectively unreasonable" about his conduct in responding to Harapat's protest on February 15, 2007.  Harapat, however, has pointed to genuine issues of material fact regarding the details of the protest and Vigil's response to the protestors.  Summary judgment is, therefore, not appropriate as to Harapat's claims for unlawful arrest, excessive force, malicious prosecution, and unlawful retaliation, and thus the Court will deny Vigil's motion for summary judgment.

## I.    THERE ARE GENUINE ISSUES OF MATERIAL FACT THAT PRECLUDE DISMISSAL OF THE UNLAWFUL-ARREST CLAIM.

Summary judgment on the basis of qualified immunity is inappropriate where there is a factual dispute involving an issue on which qualified immunity turns.  See Poe v. Haydon, 853 F.2d 418, 426 (6th Cir. 1988).  Viewing the evidence presented in the light most favorable to Harapat, the Court finds that it is uncertain whether Vigil is entitled to qualified immunity for Harapat's unlawful-arrest claim.  Accepting Harapat's factual assertions as true, as the Court must when deciding a motion for summary judgment, Harapat has presented sufficient evidence to show that Vigil violated a constitutional right.   An officer violates a citizen's clearly established

-24-

Fourth Amendment right to be free of unreasonable seizure if the officer makes a warrantless arrest without probable cause.  See Olsen v. Layton Hills Mall, 312 F.3d at 1312.  Vigil argues that he had probable cause to prepare and file a criminal complaint against Harapat for public nuisance, disorderly conduct, and unlawful assembly.  The facts, as presented by Harapat, however, suggest that an objectively reasonable officer could not have believed that probable cause existed.  The Tenth Circuit requires that the surrounding circumstances, viewed objectively, must justify arrest. See Apodaca v. City of Albuquerque, 443 F.3d at 1289.

Disorderly conduct is defined as: "engaging in violent, abusive, indecent, profane, boisterous, unreasonably loud or otherwise disorderly conduct which tends to disturb the peace." NMSA 1978, § 30-20-1(A).  Viewing the facts in a light most favorable to Harapat, he presented evidence that he was not engaged in behavior that falls within the scope of the state statute.  He states that he was quietly protesting and did not raise his voice at any time.  See Harapat Aff. ¶¶ 11, 23, at 6-7.  Turner, the employee inside the District Attorney's Office, stated in her deposition that Harapat was not saying anything and that "he was just standing there."  Pl. Response Exhibit 1 25:7-12, at 2.  Kittell explained that he and Harapat were experienced protesters, and that they knew the rules that they were not to block the public or be rude.  See Pl. Response Exhibit 3 50:13-18, at 3.  Esquibel, the deputy sheriff, stated that there were no complaints from anyone about the protest and that he could not hear any shouting, Harapat and the others did not interfere with anyone on the sidewalk, and he noticed nothing unusual about the way they were protesting. See Pl. Response Exhibit 7 50:4-7, 51: 10-52:3, at 2.  The facts viewed in the light most favorable to Harapat show that when Vigil came out of the building, Harapat tried to calmly explain that they had protested there before and that they should be permitted to continue. The Court finds that the evidence is sufficient that a reasonable jury could find that Harapat had not engaged in disorderly

conduct and that Vigil did not have an objectively reasonable ground for probable cause on that ground.

Public nuisance consists of: "[K]nowingly creating, performing or maintaining anything affecting any number of citizens without lawful authority which is either: (A) injurious to public health, safety, morals or welfare; or (B) interferes with the exercise and enjoyment of public rights, including the right to use public property." NMSA 1978, § 30-8-1. Vigil contends that Harapat was yelling, waving his arms, and getting in "our faces," which he states could have resulted in injury. Motion Exhibit C, Statement of Probable Cause at 1, filed March 23, 2009 (Doc. 43-4). Harapat has brought forth evidence, however, from multiple sources, as just discussed, which shows that there is a genuine issue of fact whether these actions by Harapat, which Vigil contends gave him probable cause for arrest, took place. Moreover, in New Mexico "[a] public nuisance must affect a considerable number of people or an entire community or neighborhood." Environmental Imp. Div. of New Mexico and Envtl. Dep't v. Bloomfield Irrigation Dist., 108 N.M. 691, 696, 778 P.2d 438, 443 (Ct. App. 1989). Harapat's affidavit, as well as the deposition of the deputy sheriff, raise issues of fact whether the protest disturbed or injured the public. The Court holds that there is sufficient evidence that a jury could find that a reasonable officer could not have found probable cause for arresting Harapat for public nuisance.

Vigil also charged Harapat with unlawful assembly, which consists of "three or more persons assembling together with intent to do any unlawful act with force or violence against the person or property of another, and who shall make any overt act to carry out such unlawful purpose." NMSA 1978, § 30-20-3. The facts viewed in the light most favorable to Harapat indicate that he neither intended to commit any act of force or violence, nor did he commit any such act on February 15, 2007. The Court finds that there is sufficient evidence that a jury could find that a

reasonable officer could not have found probable cause for arresting Harapat for unlawful assembly.

Moreover, Vigil's argument that Harapat cannot establish the second prong of the qualified immunity inquiry because Vigil is unaware of any legal authority which has held that it is unlawful to arrest an individual for disregarding the directives of a law enforcement officer is unpersuasive. First, Vigil did not arrest Harapat for violating the statute regarding police instructions that Vigil cites.  See NMSA 1978, § 66-7-4.  Rather, Harapat was charged with public nuisance, disorderly conduct, and unlawful assembly.  See Motion, Exhibit B, at 1.  A reasonable fact-finder could conclude that this assertion of a new basis for the arrest is a pretext and suggests Harapat's version of events.  Second, the invocation of the police instruction statute may be misplaced, as it refers to the directions and instructions of traffic officers.  Vigil's selectively incomplete quotation of the statute may not be enough to support probable cause, and may be evidence of pretext.  To meet the second prong of the qualified immunity inquiry, Harapat must show that there is clearly established legal authority that it is unlawful to arrest without an objectively reasonable belief that there is probable cause.  The Court believes that Harapat has met his burden.

Because there are factual issues on which qualified immunity turns, granting summary judgment on Harapat's unlawful arrest claim based on qualified immunity is not appropriate, and the Court will deny the motion on that claim.

## II.     HARAPAT HAS PRESENTED SUFFICIENT EVIDENCE TO PRECLUDE DISMISSAL OF THE EXCESSIVE-FORCE CLAIM.

The inquiries into whether Harapat can sustain an unlawful-arrest claim and an excessive-force claim are separate and independent, though the evidence may overlap.  See Cortez v. McCauley, 478 F.3d at 1127.  "[Harapat] might succeed in proving the unlawful arrest claim, the excessive force claim, both, or neither."  Id.  The Court must assess whether Vigil's actions were

objectively reasonable in light of the facts and circumstances confronting him, without regard to his underlying motive or intent.  See Graham v. Connor, 490 U.S. at 396-97.  The Court agrees with Harapat that the test is not what Vigil believed was reasonable, but what a reasonably prudent law enforcement officer would have found reasonable.  See id.

The Tenth Circuit has explained:

Reasonableness is evaluated under a totality of the circumstances approach which requires that we consider the following factors: the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.

Weigel v. Broad, 544 F.3d at 1151-52 (internal quotations and citations omitted).  The determination whether the force used was reasonable "requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake."  Graham v. Connor, 490 U.S. at 396.

The Tenth Circuit has "consistently rejected a bright-line rule requiring plaintiffs to demonstrate physical injury when bringing excessive force claims."  Vondrak v. City of Las Cruces, 535 F.3d at 1208.  See Holland v. Harrington, 268 F.3d 1179, 1195 (10th Cir. 2001)("We likewise decline to adopt a 'bright-line' standard dictating that force cannot be 'excessive' unless it leaves visible cuts, bruises, abrasions or scars.").  Taken in the light most favorable to Harapat and evaluating the totality of the circumstances, the facts which Harapat alleges are sufficient that a reasonable jury could find that Vigil violated Harapat's Fourth Amendment rights by using excessive force during the arrest.  The severity of the crimes allegedly committed by Harapat were petty misdemeanors, see Motion Exhibit B, Amended Criminal Complaint at 1, and viewing the facts in the light most favorable to Harapat, he did not physically resist arrest, and there is little indication that Harapat posed an immediate threat to Vigil or others.

The Supreme Court has stated that a small amount of force, such as an arrest where one is

handcuffed, placed in a police vehicle, and taken to the police station may be inconvenient and embarrassing, but it does not rise to the level of excessive force. See Atwater v. City of Lago Vista, 532 U.S. 318, 354-55 (2001). However, "[i]n some circumstances, unduly tight handcuffing can constitute excessive force where a plaintiff alleges some actual injury from the handcuffing and alleges that an officer ignored a plaintiff's timely complaints (or was otherwise made aware) that the handcuffs were too tight." Cortez v. McCauley, 478 F.3d at 1129. The Tenth Circuit requires more than de minimis injury. See id. (soreness and chaffing of the wrists was not enough to establish a constitutional violation). Harapat has indicated that Vigil put on the handcuffs "as hard as he could" and then pushed Harapat into his sheriff's vehicle, causing injury to his leg and resulting in bruising and redness to his upper left leg. Harapat also has stated that he informed Vigil that the handcuffs were on too tight but that Vigil ignored him. To this day, Harapat suffers from limited flexibility and pain in his wrist. Taking the facts in the light most favorable to Harapat, a reasonable jury could find that the force was excessive and the force used was beyond what a reasonable officer in a similar situation would use. Moreover, the protection against excessive force is well established, and a reasonable officer would be on notice that behavior such as using excessive force to shove an arrestee into a vehicle hard enough to cause bruising is unlawful. Vigil stressed in both his Motion and in his subsequent Reply that "this is not a case where a law enforcement official mercilessly beat a plaintiff." Motion at 11; Reply at 8. However, the standard for excessive force is not one of "excessive injury," but rather one of "actual injury." Because the factors of the surrounding circumstances weigh in favor of Harapat and because he has alleged sufficient evidence of actual injury caused by Vigil, the Court finds it is not appropriate to grant qualified immunity and will deny summary judgment on the excessive force claim.

**III.    THERE IS SUFFICIENT EVIDENCE FOR A REASONABLE JURY TO INFER VIGIL ACTED WITH MALICE SUFFICIENT TO ESTABLISH HARAPAT'S MALICIOUS-PROSECUTION CLAIM.**

To establish a claim of malicious prosecution, Harapat must establish: (i) Vigil caused Harapat's prosecution; (ii) the original action terminated in favor of Harapat; (iii) no probable cause supported the original arrest; and (iv) Vigil acted with malice.  See Wilkins v. DeReyes, 528 F.3d at 799.  Vigil contends that he is entitled to qualified immunity on Harapat's malicious-prosecution claim because he had probable cause to arrest Harapat.  As discussed previously, the Court finds that Harapat has presented sufficient evidence that a genuine issue of fact exists whether there was probable cause.  There is no dispute that Vigil arrested Harapat, took him to jail, and filed a complaint initiating criminal action against him.  There is also no dispute that the magistrate court dismissed the charges brought against Harapat without prejudice for insufficient evidence.  See Amended Complaint ¶ 15 at 4; Tr. at 50:220-21 (Quinones).  Vigil argues that, assuming Harapat can meet the other three elements, he cannot show evidence of malice on the part of Vigil.  See Reply at 10.  Harapat contends that there is sufficient evidence from which a jury could reasonably infer that Vigil acted with the requisite malice by his angry demeanor, his attempt to unlawfully disperse Harapat and the other protesting men, and his refusal to loosen Harapat's handcuffs.  He believes that it is reasonable that Vigil would have understood the situation he confronted as soon as he stepped outside of the District Attorney's Office and witnessed three men with signs criticizing the District Attorney and others.  Moreover, Vigil's instructions to move the protest activity also make it a reasonable inference that he understood the men were protesting.  Assuming that a jury found no probable cause, taking the facts presented in the light most favorable to Harapat, the Court believes that a reasonable jury could also infer that Vigil's demeanor, as attested to by Harapat, and the subsequent arrest, could demonstrate the requisite malice required

to establish a malicious prosecution claim.  The Court, therefore, will not grant Vigil qualified immunity and will deny his motion for summary judgment with regards to Harapat's malicious prosecution claim.

## IV.  THERE IS SUFFICIENT EVIDENCE FOR A REASONABLE JURY TO INFER THAT HARAPAT SUFFERED UNLAWFUL RETALIATION.

Harapat's asserted theory of retaliation is that Vigil arrested him in retaliation for Harapat's exercise of his right to protest under the First Amendment of the Constitution of the United States. To establish a § 1983 retaliation claim against Vigil, Harapat must plead and prove (i) that Harapat was engaged in a constitutionally protected activity; (ii) that Vigil's actions caused Harapat to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity; and (iii) that Vigil's action was substantially motivated as a response to Harapat's exercise of a constitutionally protected right.  See Worrell v. Henry, 219 F.3d at 1212.  In addition, Harapat must plead and prove the absence of probable cause.  See Hartman v. Moore, 547 U.S. at 266.

As discussed before, Harapat has provided sufficient evidence that there is a genuine issue of material fact regarding whether there was probable cause.  Harapat has also shown sufficient evidence that he was exercising his First Amendment speech rights when he protested on February 15, 2007.  Vigil does not dispute that this first element of the retaliation claim has been satisfied. See Hearing Transcript at 40:21-23 (taken June 26, 2009)("Tr.")(The Court, Quinones).[7]  Further, the Court finds that there is sufficient evidence to show that being arrested in response to lawful protesting, as Harapat contends, is enough for a reasonable jury to infer that a reasonable person would be chilled from continuing to exercise his or her constitutionally protected free-speech rights. Vigil contends that, because he had no involvement with Harapat before walking outside the District

---

[7]  The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version.  Any final transcript may contain slightly different page and/or line numbers.

Attorney's Office to witness the situation on February 15, 2007, a fact that Harapat does not dispute, Vigil could not have been acting in retaliation towards Harapat.  Harapat contends, however, that Vigil witnessed the scene of Harapat, Bustos, and Kittell exercising their free speech rights as soon as he walked outside on the day in question.  Further, he informed the protesting men that they had to cross the street, and Harapat and Kittell informed Vigil that they were exercising their constitutional rights and had done so before.  Harapat contends that a reasonable fact-finder presented with Vigil's statements that Harapat and the others could not protest where they were and that they had to move out of sight could infer that Vigil had the intent to arrest the men as a response to them exercising their constitutional rights.  The Court believes that Harapat has presented sufficient evidence for a reasonable jury to infer a retaliatory motive behind Vigil's actions.  The Court, therefore, will deny Vigil's motion for summary judgment as to the claim of retaliatory action.

Ultimately, the Court finds that summary judgment is not appropriate on  Harapat's claims. There are genuine issues of material facts regarding the details leading up to the arrest and of the arrest itself sufficient that a reasonable jury could find in favor of Harapat.  Moreover, the facts presented are sufficient to meet the two-part test to defeat qualified immunity because Harapat has established enough genuine issues of fact that a reasonable jury could find that Vigil violated Harapat's constitutional rights and, moreover, that the constitutional rights that were violated were clearly established, and the facts are sufficient that a reasonable jury could determine that Vigil's actions were not the actions of an objectively reasonable individual.

**IT IS ORDERED** that Defendant Vigil's Motion for Partial Summary Judgment on Basis of Qualified Immunity and Other Grounds, and Supporting Memorandum is denied.

_____
UNITED STATES DISTRICT JUDGE

_Counsel:_

Adam S. Baker
Taos, New Mexico

-and-

Alan H. Maestas
Maestas & Boothby, P.C.
Taos, New Mexico

     _Attorneys for the Plaintiff_

Carlos M. Quinones
Quinones Law Firm
Santa Fe  New Mexico

     _Attorney for Defendant Benji Vigil_

Luis E. Robles
Rodney L. Gabaldon
Robles, Rael & Anaya, P.C.
Albuquerque, New Mexico

     _Attorneys for Defendants Phil Esquibel, Tony Valdez, Richard Flores_